1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| TAOGLAS GROUP HOLDINGS LIMITED, et al., | Case No.: 18CV1277-LAB (LL) |
| Plaintiffs, | **ORDER GRANTING IN PART MOTION TO DISMISS** |
| v. | |
| 2J ANTENNAS USA, CORPORATION, et al., | |
| Defendants. | |

Plaintiffs Taoglas Group Holdings Ltd. and Taoglas USA, Inc. (collectively, "Taoglas") are in the antenna business, and compete with Defendant 2J Antennas USA, Corporation. Defendant Javier Ruben Flores Cuadras worked for Taoglas USA, but left in October of 2014. Shortly before he left, he signed an agreement concerning confidentiality and non-competition. He later began working for 2J Antennas. Plaintiffs allege Cuadras and 2J Antennas misappropriated their trade secrets and used them to compete with Plaintiffs.

Plaintiffs filed suit, bringing claims under the federal Defend Trade Secrets Act (DTSA), California's Uniform Trade Secrets Act (UTSA), and for breach of contract and intentional interference with contractual relations. Because the

parties are not diverse, the Court is exercising federal question jurisdiction over the DTSA claim and supplemental jurisdiction over the others. Defendants moved to dismiss for failure to state a claim. The motion is fully briefed, and the Court is now prepared to rule on it.

**Legal Standards for Motions to Dismiss**

The Court is exercising supplemental jurisdiction over Plaintiffs' state law claims and therefore applies state substantive law but federal procedural law. *Cortez v. Skol*, 776 F.3d 1046, 1054 n. 8 (9th Cir. 2015). Because pleading standards are procedural, the Court therefore applies federal rather than state pleading standards to all claims. *See Hatton v. Bank of America, N.*A., 2015 WL 6739137, at *3 (E.D. Cal., Nov. 2, 2015) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003)).

A motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[S]ome threshold of plausibility must be crossed at the outset" before a case is permitted to proceed. *Id.* at 558 (citation omitted). The well-pleaded facts must do more than permit the Court to infer "the mere possibility of conduct"; they must show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

When determining whether a complaint states a claim, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars-Sinai Medical Center v. National League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007) (citation omitted). At the pleading stage, the Court may consider not only the complaint itself, but also documents it refers to, whose authenticity is not questioned, and matters judicially noticed. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). The Court is "not required to accept as true conclusory

allegations which are contradicted by documents referred to in the complaint," and does "not . . . necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citations and quotation marks omitted). To meet the ordinary pleading standard and avoid dismissal, a complaint must plead "enough facts to state a claim that is plausible on its face." *Twombly*, 550 U.S. at 570.

New or expanded allegations in opposition to a motion to dismiss are considered when deciding whether to grant leave to amend, but are not considered when ruling on a 12(b)(6) motion. *See Schneider v. Cal. Dep't of Corr. & Rehab.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). *See also Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).

In federal court, plaintiffs seeking relief for misappropriation of trade secrets must identify what they are, and should describe them with sufficient particularity to separate them from either matters of general knowledge in the trade or of special knowledge of those skilled in the trade. *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). *Imax* dealt with a summary judgment motion, however, and this requirement is generally applied in a more relaxed form at the pleading stage. *Profil Institut fur Stoffwechselforschung GmbH v. ProSciento, Inc.*, 2017 WL 1198992, at *5 (S.D. Cal., Mar. 31, 2017).

**Factual Allegations**

Taoglas, founded in 2004, is a multinational company headquartered in Ireland. Its main in-house production facility is in Taiwan. It also has technology centers in the U.S. and Germany. It invests substantial time, effort, and money to research, develop, and improve its products, and has a portfolio of international patents. The Complaint alleges in a general way the steps Taoglas takes to protect its trade secrets.

/ / /

In March of 2008, Taoglas hired Cuadras as a radio frequency and antenna engineer. Around 2009, Taoglas opened an office in San Diego and Cuadras began working there. His role at Taoglas expanded over time. In July of 2011, he was promoted to Engineering Manager, where he was responsible for managing all engineers and engineering projects in North and South America. In this role, he was involved in some fashion with most of Taoglas' products sold in the U.S. from 2011 to 2014. He was a named inventor on over 34 of Taoglas' patent applications, including over 12 issued patents. By October of 2014, he knew and understood Taoglas' confidential and engineering information better than nearly anyone else at the company.

In October of 2014, Cuadras left Taoglas, saying he was going to pursue a doctorate in engineering. Before he left, he executed a confidentiality agreement ("Confidentiality Agreement" or "Agreement") that Taoglas has attached to the complaint. Some time after he left, but before August of 2015, he started working for 2J Antennas' parent corporation. He then helped open the company's San Diego office and signed 2J Antennas' articles of incorporation. He now works for 2J Antennas as its Engineering Manager, heading its engineering and business operations in the U.S. and helping to grow its domestic business.

Taoglas alleges that 2J has a pattern of selling knockoffs of Taoglas designs beginning well before Cuadras joined. In the three years since Cuadras began working for 2J, Taoglas alleges that 2J began using Taoglas' trade secrets. The complaint gives several examples.

Taoglas says it learned in May of 2016 that 2J and Cuadras had contacted one of Taoglas' customers to sell it an antenna "designed exactly to the nonpublic specifications" of an antenna Taoglas had previously sold that customer. (Compl., ¶ 30.)

Taoglas alleges that in August of 2016, it learned that 2J and Cuadras had contacted one of Taoglas' parts suppliers in Taiwan, attempting to persuade it to

sell 2J the same parts it had supplied to Taoglas. "The supplier refused to interact with Cuadras, knowing that the requested part was proprietary to Taoglas." (*Id.*, ¶ 31.)

Taoglas sent a letter to 2J around October 6, 2016, warning 2J that Cuadras' Confidentiality Agreement prohibited him from disclosing or using Taoglas' trade secrets. After this, Taoglas alleges that 2J began marketing and selling several antennas that were intentional knockoffs of Taoglas' antennas, and made use of trade secrets to do so. (Compl., ¶¶ 33, 35–38.) The Complaint describes how clients bought one of these, based on its lower price. (*Id.*, ¶ 34.) Taoglas believes 2J has used Cuadras' inside knowledge to create knockoffs of many other products, but without discovery cannot allege what those are.

**Judicial Notice**

Defendants have asked the Court to take judicial notice of various documents from Taoglas' website, which they argue are matters of public record. Information on websites can sometimes be judicially noticed. But, with exceptions not applicable here, federal have been reluctant to take judicial notice of information on the website of one of the parties to the litigation. *See Gerritsen v. Warner Bros. Entertainment, Inc.*, 112 F. Supp. 3d 1011, 1030–31 (C.D. Cal., 2015) (declining to take judicial notice of material on Warner Brothers' website). Furthermore, it appears that the Court is being asked to take notice, not just of material on the website, but to accept the truth of facts contained in that material. This material might be proper at the summary judgment stage, but Defendants have not shown that it is properly noticeable under Fed. R. Evid. 201. The request for judicial notice is **DENIED**.

**Discussion**

Several claims depend on a breach of duty by Cuadras. The Complaint alleges that this arose under the Confidentiality Agreement. In their opposition brief, Plaintiffs also argue that Cuadras had a fiduciary duty to Taoglas even in the

18CV1277-LAB (LL)

absence of any agreement.  They cite *Hong Que, Inc. v. Luu*, 150 Cal. App. 4th 400 (Cal. App. 6 Dist. 2007) for this principle.  But Cuadras is not alleged to have taken trade secrets improperly during his employment with Taoglas, or to have committed any misappropriation then. Rather, the Complaint seeks to hold Cuadras to a fiduciary duty after he left Taoglas' employment.  But in the absence of some kind of covenant, agreement, or other source of a duty, former employees do not owe a fiduciary duty to their former employers. *See* Restatement (Second) of Agency § 396; *see also Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 34, 41 (Cal. App. 6 Dist. 1987) (holding that employees owe a duty of undivided loyalty to their employer during the term of employment). *Compare Global Medical Solutions, Ltd. v. Simon*, 2013 WL 12065418, at *23 (C.D. Cal., Sept. 24, 2013) (holding that former employee could be liable for breach of fiduciary duty, because he failed to return media containing confidential information he had been asked to return while still an employee). Furthermore, even while employed, an employee can make some preparations to compete before resigning. *Huong Que*, 150 Cal. App. 4th at 414.

Under the DTSA, a trade secret includes information of various kinds, provided:

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

California law is nearly identical, defining trade secrets to include information that:

/ / /

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

Trade secrets do not include an employee's own skill and knowledge, or information that is publicly available. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1453 (Cal. App. 4 Dist. 2002); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1519 (Cal. App. 1 Dist. 1997). Information contained in patents is considered public. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009). Information obtained independently or by reverse engineering is ordinarily not a trade secret. *See Aqua Connect, Inc. v. Code Rebel, LLC*, 2012 WL 469737, at *2 (C.D. Cal., Feb. 13, 2012).

**DTSA**

Because the parties are not diverse, jurisdiction depends on Plaintiff's one federal claim, under the DTSA.

Defendants' motion to dismiss points out that the by its terms, the DTSA applies only to acts of misappropriation on or after May 11, 2016. Defendants argue that any alleged acts of misappropriation occurred before that date—or at least, Taoglas has failed to allege otherwise. Because the statute creates this cause of action, *see* 18 U.S.C. § 1836(b)(1), Plaintiffs must allege facts showing that 2J's or Cuadras' actions, or both, occurred on or after the operative date. *See Iqbal,* 677–78 (holding that pleadings must show that the pleader is entitled to relief). It is not enough to plead facts to show that Defendants' misappropriation *could* have occurred after the operative date. *Id.* at 678 (pleading facts that are "merely consistent with" defendants' liability is insufficient); *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 WL 1436044, at *5 (N.D. Cal. Apr. 24,

2017) (dismissing DTSA claim, where "plaintiff [made] no specific allegations that defendant used the alleged trade secrets after the DTSA's May 11, 2016 enactment").

Defendants correctly point out that most of the allegations merely identify the time when Taoglas learned about the misappropriation, leaving open the distinct possibility that it occurred before the operative date and is therefore not actionable under this statute. But Defendants incorrectly read the statute as applying only to initial disclosures, and not to later use of secrets disclosed before the operative date. The DTSA in fact defines misappropriation as including use of trade secrets acquired under certain circumstances. *See* § 1839(5)(B)(ii). These include use without consent of trade secrets by someone who:

> at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .

§ 1839(5)(B)(i)(I)–(III).

Taoglas does not allege Cuadras used improper means to acquire the trade secrets. *See* § 1839(5)(B)(i)(I). Rather, it claims he was under an obligation not to misuse the trade secrets he had acquired during his employment with Taoglas. *See* § 1839(5)(B)(ii)(II)–(III). The Complaint alleges use of the trade secrets, when 2J Antennas began selling knockoffs after receiving Taoglas' letter in October of

/ / /

2016. The allegations appear to bring 2J Antennas' use of the information it acquired through Cuadras within the provisions set forth in § 1839(5)(B)(ii)(II)–(III).

Defendants cite *Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, 2017 WL 412524 at *9 (N.D. Cal., Jan. 31, 2017) to argue that the later use of trade secrets disclosed before the DTSA's enactment is not actionable. *Avago*, however, addressed a situation where allegedly secret information was disclosed in a patent application before the DTSA's enactment, and the defendant continued to use it to prosecute the patent. In that case, the information had already lost its status as a trade secret before the DTSA's enactment, due to its inclusion in a patent application. *Id.* at *8–9. Furthermore, *Avago* acknowledges that acts occurring after the DTSA's enactment <u>can</u> be actionable, even if they involve trade secrets misappropriated before its enactment. *Id.* (citing *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 2016 WL 5391394, at *1 (M.D. Fla. Sept. 27, 2016)).

The Complaint alleges the information necessary to create some of the claimed knockoffs, which it calls the "2J Ceramic Antennas" was non-public and could not have been acquired except by misappropriation. (*See* Compl., ¶¶ 35–37.) Taoglas does not claim that all of the similarities between its antennas and the "2J Ceramic Antennas" are the result of misappropriation, only that some of them are. (*See id.*, ¶ 38 (alleging that 2J relied in part on a One of the similarities between Taoglas' antennas and the "2J Ceramic Antennas," however, is alleged to be the result of 2J relying on a patent, which is public information. (*Id.*, ¶ 38.) As to others, however, the Complaint merely alleges they are so similar that Cuadras must have been involved in the development of the knockoff. (*Id.*, ¶¶ 33–34.)

Cuadras' attempt to sell an antenna to one of Taoglas' customers and the proprietary parts 2J Antennas attempted to order from the Taiwanese supplier are not alleged to have occurred after the DTSA's effective date. But even if they had been, these two incidents are not adequately alleged to have involved / / /

misappropriation of trade secrets. Both incidents are also consistent with 2J's and Cuadras' use of information that are not trade secrets.

Furthermore, the Complaint does not allege facts showing that Taoglas knew or had reason to know, before October of 2016, that Cuadras had entered into the Confidentiality Agreement. One of the requirements for a claim under § 1839(5)(B)(ii) is that the alleged misappropriator "knew or had reason to know" at the time that the person it got the trade secret from was under a duty to maintain secrecy. The allegations at most show that 2J might have known that Cuadras was subject to confidentiality obligations.

While Plaintiffs' opposition briefing identifies various categories of trade secrets (Opp'n at 11:5–20), most are not alleged with enough specificity to show that they are trade secrets. For example, while customer lists are often trade secrets, the Complaint does not allege that the identities of two of Taoglas' customers is a secret, or was adequately protected. Allegations about "pricing strategy" are likewise too generalized; the only clear allegation is that 2J competed successfully by offering a lower price on a similar antenna. Both of these *could* be trade secrets, and 2J's and Cuadras' use of them *could* amount to misrepresentation. But the allegations are equally consistent with the use of information that is not a trade secret. For example, any competitor, not just one in possession of a trade secret, could have identified one or two customers without the use of customer lists, and could have obtained pricing information or specifications from the customer. While the Confidentiality Agreement identifies certain categories of information Cuadras was forbidden to use or disclose, the information to be kept confidential is broader than trade secrets.

The briefing focuses on whether Taoglas adequately protected its trade secrets. The only trade secrets that are both adequately pled and the subject of an adequately-pled claim are those relating to non-public information concerning the design and manufacture of the "2J Ceramic Antennas." The briefing alleges that

one of the protective measures Taoglas took was to require employees, contractors, consultants, vendors, customers, and manufacturers to sign confidentiality agreements. As Defendants have correctly pointed out, this cannot be completely accurate as to the time period when Cuadras worked, because he was not required to sign such an agreement until shortly before he left. The Complaint alleges other measures Taoglas took, however, including limiting access to information. Whether these measures are reasonable under the circumstances cannot be decided at the pleading stage. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724-25 (7th Cir. 2003) (whether measures taken to protect trade secrets were reasonable is generally a question of fact for the jury, and only in extreme cases can be decided as a matter of law).

As discussed above, the only adequately-alleged claim concerns the design, manufacture, and marketing of "2J Ceramic Antennas," all of which the Complaint alleges 2J began marketing after October of 2016. Because the Complaint does not allege any act by Cuadras in connection with these antennas on or after May 11, 2016, this claim is properly pled as to 2J Antennas only.

**UTSA**

Claims under California's UTSA are similar in most respects to DTSA claims, except that they need not have arisen on or after May 11, 2016. The only adequately-pled claims are those related to the "2J Ceramic Antennas." Because Taoglas need not show when Cuadras disclosed proprietary information about how to make these antennas, this claim can is properly pled as to him as well as to 2J Antennas. The remaining claims, as discussed above, are not.

**Contract Claims**

Plaintiffs bring a breach of contract claim against Cuadras, and an intentional interference with contract claim against 2J Antennas. The briefing focuses on whether the Confidentiality Agreement is enforceable, or whether it fails for want of consideration. It also focuses on whether Defendants knew about the contract

and intentionally breached it. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (setting forth elements of intentional interference with contractual relations).

Cuadras signed the Agreement on October 2, 2014, which is the same month he left Taoglas. The Agreement says it is "made as a condition of Employee's employment or continued employment" with Taoglas. The Agreement required Cuadras to keep trade secrets confidential, and prohibited him from soliciting any of Taoglas' customers for a period of two years after he left employment there. It also required him to advise any future employer about the Agreement's restrictions before accepting employment there.

Under California law, "the employment relationship is fundamentally contractual . . . ." *Foley v. interactive Data*, 47 Cal.3d 654, 696 (1988). At the time he worked for Taoglas, Cuadras and Taoglas were operating under an unwritten unilateral employment agreement. *See Asmus v. Pac. Bell*, 23 Cal.4th 1, 10 n.4 (2000) ("An employment contract in which the employer promises to pay an employee a wage in return for the employee's work is typically described as a unilateral contract.") Such contracts can be modified by written agreement, however. For example, an employer may change the existing agreement by giving employees reasonable notice, and an opportunity to reject it or keep working and accept it. *See id.* at 14–15. If they continue working, their continued employment can serve as adequate consideration. *Id.*

Based on the allegations, and drawing all inferences in Plaintiffs' favor, that appears to have been the case here. After signing the Confidentiality Agreement, Cuadras continued to work for Taoglas, albeit for a fairly short time. If Cuadras had refused to agree, Taoglas could have terminated his employment immediately, and might have taken more precautions to protect their proprietary information. It is also possible that the Confidentiality Agreement was in fact a termination agreement. If Cuadras signed it and immediately departed, Defendants might be

able to show a lack of consideration. But drawing reasonable inferences in Plaintiffs' favor, he continued to work for some time, providing consideration for the Agreement.

The alleged misappropriation described above would amount to a breach of the contract, and 2J Antennas' role in encouraging or inducing Cuadras to breach his contract could amount to intentional interference with the Agreement. In addition, Taoglas claims that 2J and Cuadras solicited a Taoglas customer, Road Track, around May of 2016 using Cuadras' knowledge about Taoglas' business relationship with Taoglas. While this was not adequately pled as a misappropriation claim, it could plausibly be a breach of the Agreement, which applies to a broader class of information than trade secrets, and includes a non-solicitation clause.

Cuadras' and 2J Antennas' attempt to purchase parts from the Taiwanese supplier might be a violation of the Agreement as well, although no damages resulted from that because the supplier refused to sell them parts. *See Pac. Gas & Elec. Co.*, 50 Cal.3d at 1126 (listing damages as an element of an intentional interference claim).

Because the non-solicitation clause expired October 2, 2016, Cuadras' solicitation of customers after October of 2016 did not violate this Agreement. His alleged misappropriation of trade secrets as well as his alleged use of other confidential information would, however, violate it even after that date.

Although the Agreement required Cuadras to notify 2J Antennas of the Agreement's terms, the Complaint does not allege whether he did this. The first time it alleges 2J had knowledge of the Agreement was in October of 2016. Therefore, although Cuadras could be liable for breach of the Agreement any time after he signed it, the allegations only establish liability as to 2J Antennas for acts after October of 2016. The only specific acts alleged relate to the design, manufacturing, and sale of the "2J Ceramic Antennas."

18CV1277-LAB (LL)

**Conclusion and Order**

For these reasons, the motion to dismiss is **GRANTED IN PART**. The DTSA claim concerning the design, manufacture, and marketing of "2J Ceramic Antennas," is properly pled as to 2J Antennas only, and only for acts from October of 2016 onward. The UTSA claim for the same acts is properly pled as to both 2J Antennas and Cuadras, except that as to Cuadras, claims arising after October 2, 2014 survive as well. The breach of contract claim against Cuadras survives only as to the claim concerning marketing to Road Track and the design, manufacture, and marketing of "2J Ceramic Antennas." The intentional interference claim against 2J Antennas survives only as to claims for the design, manufacture, and marketing of "2J Ceramic Antennas" beginning in October of 2016. In all other respects, the complaint is **DISMISSED**.

If Plaintiffs believe they can successfully amend, they may file an amended complaint, remedying the defects this order has identified. Otherwise, they should file an amended complaint including only the claims this order has identified as surviving. Whichever option they choose, their amended complaint must be filed within **21 calendar days of the date this order is issued**.

**IT IS SO ORDERED**.

Dated: March 18, 2019

Hon. Larry Alan Burns
Chief United States District Judge